IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

STEVEN JARRETT PALMER,
  Petitioner,

vs.        Case No.:  5:13cv368/WS/EMT

JULIE JONES,
  Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of
habeas corpus filed under 28 U.S.C. § 2254 (ECF No. 12).  Respondent filed a motion
to dismiss the petition as untimely, with relevant portions of the state court record
(ECF No. 25).  Petitioner filed a response in opposition to the motion (ECF No. 37).
Petitioner also filed a "Request for an Enlargement of Time of Ninety (90) Days to
Allow Retained Counsel to Pursue Petitioner's Amended Postconviction Motion in
the State Court" (ECF No. 37).  Respondent filed a response in opposition to the
motion (ECF No. 40).

The case was referred to the undersigned for the issuance of all preliminary
orders and any recommendations to the district court regarding dispositive matters.
*See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).
After careful consideration of all issues raised by the parties, it is the opinion of the

undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that the amended habeas petition should be dismissed as untimely.

## I.   BACKGROUND AND PROCEDURAL HISTORY

The procedural background of this case is established by the state court record (ECF No. 25).[1]  Following a jury trial in the Circuit Court in and for Bay County, Florida, Case No. 2006-CF-2127, Petitioner was found guilty of one count of Grand Theft (value of property $100,000.00 or more) (Count I) and one count of Contracting Without Being Certified or Registered During a State of Emergency (Count II) (Ex. B).  He was sentenced on September 11, 2007, to twenty-five (25) years in prison on Count I, and a concurrent sentence of five (5) years in prison on Count II, with pre-sentence jail credit of 428 days (Ex. C).  Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D07-5181 (*see* Ex. D; *see also* Ex. G at 235–43).  The First DCA affirmed the judgment per curiam without written opinion on September 17, 2009 (*see id.*).  Palmer v. State, 22 So. 3d 543 (Fla. 1st DCA 2009).  The mandate issued December 17, 2009 (*see* Ex. F at 94).

---

[1] Hereinafter all citations to the state court record refer to the electronically filed exhibits to Respondent's motion to dismiss (doc. 25) unless otherwise indicated.  Additionally, if a cited page has more than one page number, the court cites to the "Bates stamp" page number.

On November 30, 2011, Petitioner filed, through counsel, a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, in the state circuit court (Ex. E at 78–84).  The state circuit court summarily denied five of Petitioner's eight grounds for relief, and directed the State to respond to the remaining three grounds (Ex. F).  The court denied Petitioner's remaining grounds in an order rendered December 10, 2012 (Ex. G).  Petitioner appealed the decision to the First DCA, Case No. 1D13-0243 (*see* Ex. H).  On August 19, 2013, the First DCA affirmed per curiam without written opinion (*id.*).  Palmer v. State, 122 So. 3d 372 (Fla. 1st DCA 2013) (Table).  The mandate issued October 22, 2013 (*id.*).

Petitioner filed the instant federal habeas action on November 4, 2013 (ECF No. 1), after which Respondent filed a motion to dismiss the petition as untimely (ECF No. 25).

II.    ANALYSIS

Pursuant to the requirements set forth in 28 U.S.C. § 2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, which became effective on April 24, 1996, a one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  The limitation period runs from the latest of:

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Section 2244(d)(1).

Respondent argues, and Petitioner does not dispute, that the appropriate statutory trigger for the federal limitations period is the finality date of the judgment of conviction, pursuant to § 2244(d)(1)(A) (ECF No. 25 at 4).  Under federal law, the judgment becomes final for purposes of § 2244(d)(1)(A) upon expiration of the 90-day period in which a defendant may seek direct review of his conviction in the United States Supreme Court.  The 90-day period runs from the date of entry of the judgment sought to be reviewed, which was September 17, 2009, in this case.  *See* Chavers v. Sec'y, Fla. Dep't of Corr., 468 F.3d 1273, 1275 (11th Cir. 2006). Therefore, the statute of limitations began to run on December 17, 2009, the day after

the 90-day period for Petitioner to file a petition for review in the United States Supreme Court expired.[2]  *See* <u>Wainwright v. Sec'y, Dep't of Corr.</u>, 537 F.3d 1282, 1283–84 (11th Cir. 2007) (citing Fed. R. Civ. P. 6(a)); <u>Washington v. United States</u>, 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).  Petitioner had one year from that date, or until December 17, 2010, to file his § 2254 petition.  *See* <u>Downs v. McNeil</u>, 520 F.3d 1311, 1318 (11th Cir. 2008) (limitations period should be calculated according to "anniversary method," under which limitations period expires on anniversary of date it began to run) (citing <u>Ferreira v. Dep't of Corr.</u>, 494 F.3d 1286, 1289 n.1 (11th Cir. 2007)).  On or before December 17, 2010,  Petitioner did not file any post-conviction application in state court that qualified for statutory tolling under § 2244(d)(2), nor did he file his § 2254 petition.  Therefore, it is untimely.

In several of Petitioner's filings in this case, he advised this Court that he was in the process of seeking post-conviction relief in the state courts based upon "newly discovered evidence."  On April 17, 2014, Petitioner filed a motion in this case, stating that he had hired Attorney Michael Ufferman to file a second Rule 3.850 motion, and he requested that this Court toll the federal limitations period, pursuant

---

[2] Pursuant to Rule 6 of the Federal Rules of Civil Procedure, the day of the event that triggers the time period is excluded from the calculation, and the last day of the period is included, so the federal limitations period began to run on December 17, 2009.

to § 2244(d)(2), during the pendency of the second Rule 3.850 motion (ECF No. 8).

This Court denied Petitioner's request for statutory tolling as premature in light of the

fact the state court record had not yet been filed, and this Court was thus unable to

determine whether tolling was appropriate (*see* ECF No. 9).  This Court additionally

determined that to the extent Petitioner was requesting a stay of this federal

proceeding to enable him to exhaust additional claims in the state courts, he failed to

show that use of the "stay and abeyance" procedure  approved by the Supreme Court

in <u>Rhines v. Weber</u>, 544 U.S. 269 (2005) was appropriate, because his § 2254 petition

presented only exhausted claims and thus was not a "mixed" petition (*see* ECF No.

9).

On June 4, 2014, Petitioner filed another document stating that his collateral

counsel had told him that he would file the second Rule 3.850 motion by April 28,

2014 (the deadline set by this Court for Petitioner to file an amended § 2254 petition),

but counsel had not done so (*see* ECF No. 11).

On November 7, 2014, Petitioner filed a Petition for Equitable Tolling

requesting that this Court "toll" this federal case to allow him to exhaust his "newly

discovered evidence" claim in the state courts (ECF No. 19).  Respondent filed a

response in opposition to Petitioner's motion (ECF No. 21).  This Court denied

Petitioner's request for the same reasons the Court denied his previous motion requesting the same relief (*see* ECF No. 22).

On March 30, 2015, Petitioner filed a Motion for Stay and Abeyance, stating that collateral counsel filed a second Rule 3.850 motion on December 3, 2014 (ECF No. 31).  Petitioner attached a copy of the Rule 3.850 motion to his motion for stay (*id.*, Attachment B).  This Court denied the motion for the same reasons it denied his previous motions (*see* ECF No. 32).

On August 3, 2015, Petitioner filed his response to Respondent's motion to dismiss (ECF No. 37).  He asserts that since September of 2009, he "has diligently pursued his remedies at law to include seeking relief at the State level as well as the federal level" (*id.* at 2).  He also asserts that his second Rule 3.850 motion is still pending in state court (*id.* at 3).  He asserts, "Petitioner has been wrongly and unjustly convicted and imprisoned based false [sic] information, innuendo, and perjured statements" (*id.*).

"Because the time period specified in 28 U.S.C. § 2244 is a statute of limitations, not a jurisdictional bar, the Supreme Court has held § 2244(d) does not bar the application of equitable tolling in an appropriate case."  Cole v. Warden, Ga. State Prison, 768 F.3d 1150, 1157 (11th Cir. 2014) (citing Holland, 560 U.S. at 645). "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been

pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649.  As an extraordinary remedy, equitable tolling is "limited to rare and exceptional circumstances and typically applied sparingly."  Cadet v. Fla. Dep't of Corr., 742 F.3d 473, 477 (11th Cir. 2014).

Equitable tolling is assessed on a case-by-case basis, considering the specific circumstances of the case.  Hutchinson v. Florida, 677 F.3d 1097, 1098 (11th Cir. 2012); *see* Holland, 560 U.S. at 649–50 (clarifying that the exercise of a court's equity powers must be made on a case-by-case basis).  The petitioner has the burden of establishing his entitlement to equitable tolling; his supporting allegations must be specific and not conclusory.  Hutchinson, 677 F.3d at 1099.  "The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence."  Holland, 560 U.S. at 653; *see also* Smith v. Comm'r, Ala. Dep't of Corr., 703 F.3d 1266, 1271 (11th Cir. 2012) (per curiam) (acknowledging petitioners are not required "to exhaust every imaginable option, but rather to make reasonable efforts").  Determining whether a factual circumstance is extraordinary to satisfy equitable tolling depends not on how unusual the circumstance alleged to warrant tolling is among the universe of prisoners, but rather how severe an obstacle it is for the

prisoner endeavoring to comply with AEDPA's limitations period.  <u>Cole</u>, 768 F.3d at 1158 (quotation marks and citation omitted).

Here, Petitioner's bald assertion that he has been diligently pursuing state and federal remedies since September of 2009 falls far short of establishing his entitlement to equitable tolling.  Further, he has not alleged the existence of any circumstance, let alone an extraordinary one, that stood in his way and prevented him from filing a § 2254 petition on or before December 17, 2010.  Indeed, Petitioner does not allege he made any attempt to even ascertain the federal deadline.  Therefore, he failed to show he is entitled to equitable tolling of the federal limitations period.

To the extent Petitioner argues he is entitled to review of his § 2254 claims through the "actual innocence" exception to the time bar, he has failed to show he qualifies under that exception.  In <u>McQuiggin v. Perkins</u>, — U.S. —, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013), the Supreme Court held that there is an "equitable exception" to the statute of limitations set forth in § 2244(d), but only when the petitioner presents new evidence that shows it is more likely than not that no reasonable juror would have convicted him.  133 S. Ct. at 1928, 1931, 1933.  The Court cautioned that "tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of [ ] new evidence, no juror, acting reasonably, would have voted to find him

guilty beyond a reasonable doubt.'" *Id.* (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 329, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) and citing <u>House v. Bell</u>, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)).

> The Supreme Court stated in <u>Schlup</u>:
>
> > a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

513 U.S. at 327.  The Supreme Court has explained that "'actual innocence' means factual innocence, not mere legal insufficiency."  <u>Bousley v. United States</u>, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998).

In analyzing whether it is more likely than not that no reasonable juror would have convicted the petitioner in light of the "new evidence," the habeas court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  <u>House</u>, 547 U.S. at 538 (internal quotation marks omitted).

This Court liberally construes Petitioner's assertion that he was "wrongly and unjustly convicted and imprisoned based false [sic] information, innuendo, and perjured statements" as a claim of actual innocence, and the court assumes that the

factual basis for Petitioner's claim is the same as the factual basis for his "newly discovered evidence" claim asserted in his second Rule 3.850 motion, which is part of the record here (*see* ECF No. 40, Ex. A).  In that state court motion, Petitioner states that a key aspect of the State's case with regard to the charge of contracting without a license, was the State's contention that Petitioner misrepresented to the victim, Ashley Griffin, that he had a Florida contractor's license (*see id.* at 5–6). Petitioner asserts that in support of this theory, the State admitted into evidence a contract which was only one page in length (*id.*).  Petitioner admits he signed his name above the line stating "Contractor/Jarrett Palmer" (*id.*).  He alleges that Ms. Griffin testified that she was "under the impression the Defendant was a licensed contractor in Florida" (*id.*).  Petitioner alleges that in closing argument, the prosecutor referred to the contract, signed by him and Ms. Griffin on March 1, 2005, as a "one page contract" (*id.*).

Petitioner alleges that in 2013, his former co-worker, Mr. Jim Corley, informed him that he had discovered a copy of the complete contract, which was <u>ten</u> pages in length (*see* ECF No. 40, Ex. A at 6–7 & n.1).  Apparently, the first page of the ten-page contract is the "one page contract" admitted into evidence at trial.  Petitioner attached a copy of the ten-page contract ("Complete Contract") to his state motion for post-conviction relief (*see id.*, Attachment).  Petitioner alleges that when he was

arrested, Mr. Corley closed his office and placed his files and documents in a storage unit (*see* ECF No. 40, Ex. A at 6–7 & n.1).  Petitioner alleges that Mr. Corley did not realize he had a copy of the Complete Contract in his office when he placed his files and documents in storage, and did not discover the document until 2013 (*id.*).  Petitioner alleges he (Petitioner) did not have physical access to the Complete Contract at the time of his trial in 2007 (*id.* at 6).  He alleges the State did not disclose the Complete Contract during the discovery process (*id.*).

Petitioner states that Section VIII of the Complete Contract expressly states:

**Section VIII.  Designation of Contractor; State Licensed Contractor**
The contractor for this project is Global Development and Construction, a division of Global Group, Inc., an Alabama Corporation located at 106 Eastland Road, Dothan, Alabama, 36302.
(a) The contractor is not licensed in the State of Florida and will use a licensed contractor to perform this contract pursuant to Florida Law.
(b) The State of Florida licensed contractor to represent "Global" during this contract is:  Alexander Hancock.
(c) Inspections.  Mr. Hancock will perform routine inspections and stay familiar with the progress and quality of the work by making visits to the job site and will make general determinations as to whether the work is proceeding in accordance to the plans and specifications and will assist "Global" with local building codes and inspections pursuant to his agreement with "Global."
(d) Mr. Hancock will assist "Global" in the general administration of the Contract.  The primary function of the State licensed contractor is to provide the general administration of the contract and assist "Global" and sub-contractors with local building codes, rules, and state laws.

(*see* ECF No. 40, Exhibit A at 5–6, Attachment).  Petitioner signed the Complete

Contract as President of Global Development & Construction, a division of Global

Group Inc., which is identified as the "contractor" (*see id.*).  The Complete Contract

is also signed by Ms. Griffin (*id.*).  As with the one-page contract, the Complete

Contract was signed on March 1, 2005 (*id.*).  Petitioner contends the Complete

Contract refutes Ms. Griffin's testimony that she was "under the impression the

Defendant was a licensed contractor in Florida" (*id.* at 6).  He argues that if the

Complete Contract had been introduced at trial, he would have been acquitted (*id.* at

6–7).

      The fact upon which Petitioner's actual innocence claim is based is the fact that

the Complete Contract expressly notified Ms. Griffin that Petitioner was not a licensed

contractor in Florida.  Even if Petitioner himself may not have had physical access to

document at the time of his trial in 2007, he certainly knew that the contract with Ms.

Griffin was more than a single page, as evidenced by the fact that Petitioner signed the

first and last pages of the 10-page Complete Contract (*see* ECF No. 40, Ex. A,

Attachment).  Further, Petitioner knew at the time of trial that Al Hancock, a licensed

Florida contractor, was involved in Ms. Griffin's construction project, as evidenced

by the fact that Petitioner's trial counsel questioned trial witnesses about Mr.

Hancock's involvement, as discussed *infra*.  Therefore, the fact that the single page

admitted at trial was not the complete contract with the victim was not new to Petitioner.[3]  *See, e.g.,* Pace v. DiGuglielmo, 544 U.S. 408, 419 n.9, 125 S. Ct. 1807, 161 L. Ed. 2d 669 (2005) (allegedly "new" evidence submitted by petitioner in 1996 to support his claims that he received ineffective assistance of counsel and that his plea, entered in February 1986, was invalid because he did not understand that his life sentence was without the possibility of parole, was not new at all:  it consisted of affidavits from petitioner's parents and brother regarding a meeting they attended with petitioner's counsel and petitioner in 1985 or 1986).

Additionally, considering all of the evidence, old and "new," Petitioner has not persuaded this court that it is more likely than not that no reasonable juror would have convicted him if the jury had been aware of all of the terms of the contract, including Section VIII.  In addition to the one-page contract, the following evidence was admitted at Petitioner's trial.

The victim, Ashley Griffin, testified that in late 2004, she decided to build a house with a pool, separate pool house, separate garage, and barn on real property located in Bay County, Florida (ECF No. 40, Ex. C at 42–43).  She testified she was introduced to Petitioner by Petitioner's father, who told her that Petitioner was a

---

[3] Because Petitioner knew, at the time of trial, that the contract with Ms. Griffin was more than one page in length, and that Al Hancock was involved in the construction project, the statutory trigger for the limitations period provided in § 2244(d)(1)(D) does not apply.

contractor who had just opened a business in Bay County, Florida, and was building a number of houses in the area (*id.* at 44–45).  Ms. Griffin testified she met Petitioner's father and Petitioner at the property, and Petitioner "had a lot of great ideas" (*id.*).  She testified that Petitioner told her that he had a company in Dothan, Alabama, called Global Development, and that they opened an office in Bay County (*id.* at 46).  Ms. Griffin testified that she had several subsequent meetings with Petitioner, during which they discussed building the four structures on the property and drafted a full site plan (*id.* at 47–48).  She testified that Petitioner originally estimated the cost of the project as $800,000.00, but that did not include the cost of the barn, and the final estimate was 1.2 million dollars (*id.* at 49, 55, 60–61).  Ms. Griffin identified State's Exhibit C as the contract she entered into with Petitioner on March 1, 2005, and that Exhibit was admitted into evidence (*id.* at 49–50).  Ms. Griffin testified that at the time she signed the contract, she was under the impression that Petitioner was a licenced contractor in Florida (*id.* at 62).  She testified that she was under that impression because Petitioner told her that he had an office in Florida and was building other homes in the area (*id.*).  Ms. Griffin testified that while her loan application was pending with Bank South, Petitioner told her that if he did not start the project immediately, she may have to wait two years, because he had committed to other projects (*id.* at 51).  She testified that she met with Petitioner and

her business partner, Joe Shuster, and asked Shuster if he approved her using dividends from their business, Ecological Resource Consultants ("ERC"), to pay Petitioner to begin the construction project (*id.*).  She testified that Petitioner assured her and Shuster that when the bank finalized the loan, all of the non-loan funds that they had advanced would be returned to them at closing (*id.* at 51–52).  Ms. Griffin testified that Mr. Shuster approved the arrangement (*id.*).  She testified that she began paying Petitioner advances out of her personal account and ERC's account (*id.* at 52).  She testified that Petitioner told her the purposes of some of the advances, for example, stone for the fireplaces, flooring, shingles, and gravel for the driveway (*id.* at 52–53).  Ms. Griffin testified that Bank South ultimately did not approve the loan application (*id.* at 54).  She testified that she discussed the bank's rejection with Petitioner, and he told her that the problem was that he did not have sufficient income to justify a 1.2 million dollar loan (*id.* at 55).  Ms Griffin testified that she considered hiring another contractor, but Petitioner told her he was a "premiere builder" with Chevy Chase Bank, which was larger than Bank South, and that Chevy Chase Bank would approve the loan (*id.* at 55–56).  She testified that in June or July of 2005, she began the loan application process with Chevy Chase Bank, and during that time, she was still advancing funds to Petitioner for the construction project (*id.* at 56–57).  She testified that the loan was finalized on October 27, 2005 (*id.* at 58).  Ms. Griffin

testified that by that time, she had advanced approximately $1,150,000.00 to Petitioner, and paid approximately $50,000.00 directly to subcontractors (*id.* at 59). She testified that Petitioner attended the loan closing with her, and when she asked him to reimburse her for the advanced funds, as he had promised, he told her she would receive a check in a couple of days (*id.*).  She testified that he eventually reimbursed her approximately $195,000.00, and she later received approximately $50,000.00 from Chevy Chase Bank, for a total of only $245,000.00 (*id.* at 73–75, 77).  Ms. Griffin testified that a total of 117 checks were issued to Petitioner from December of 2004 through November of 2005, to construct the house and other structures on her property, and she personally signed approximately 20 of those checks (*id.* at 69–72).  She further testified that she and her attorney met with Petitioner in February of 2006, and she asked Petitioner what he had done with all of the money she had paid him for the construction project (*id.* at 76–77).  She testified that Petitioner responded that he spent it on other building projects, and that "all contractors did that" (*id.* at 76–77).  Ms. Griffin testified she had never heard of Al Hancock (ECF No. 40, Ex. D at 132–33).

Ms. Griffin admitted on cross-examination that the contract did not include a specific price of construction, just "cost plus 10 percent" (ECF No. 40, Ex. C at 99–100).  But she stated that Petitioner repeatedly told her that the cost of the

construction project would be 1.2 million dollars, so that is the amount that she financed with the bank (*id.* at 107–08, 127).

Joe Shuster testified that he and Ashley Griffin were co-owners of ERC (ECF No. 40. Ex. D at 134).  He testified that he talked to Petitioner about Ms. Griffin's building plans (*id.* at 135).  Mr. Shuster testified that he assumed that Petitioner was a licenced contractor in Florida, because Petitioner talked about the fact that he was building several other homes in the area (*id.*).  Shuster testified that between December of 2004 and November or December of 2005, he wrote checks to Petitioner as advance payments for Ms. Griffin's construction project (*id.* at 136).  He testified that he made payments to Petitioner totaling several thousand dollars for the construction project (*id.* at 137–40).

Kristen Miller testified that she was an accountant for ERC (ECF No. 40, Ex. D at 179–80).  She testified that Ms. Griffin and Mr. Shuster authorized her to pay Petitioner, out of the dividends they received from the business, for Ms. Griffin's construction project (*id.* at 180–81).  She testified that Petitioner requested, and she issued, approximately 90 checks, supposedly for materials and labor for the construction project (*id.* at 180–89).  Ms. Miller testified that the total amount paid to Petitioner was $956,635.33 (*id.* at 189–90).

Sherry Bruining, an assistant banking center manager for People's First Community Bank, testified that Petitioner conducted banking at her branch bank from March to November of 2005 (ECF No. 40, Ex. D at 158).  She testified that she remembered Petitioner because he often cashed checks in large amounts, which required her to obtain cash from the vault to provide to the tellers (*id.*).  Ms. Bruining testified that Petitioner also electronically "transferred" some of the checks into certified checks (*id.* at 160).  She authenticated digital copies of the checks, and the checks were admitted into evidence (*id.* at 155–57).  Ms. Bruining testified that Petitioner structured his cash transactions to avoid currency transaction reporting to the Internal Revenue Service (*id.* at 161–68).

Kelly Shephard testified that she was Petitioner's bookkeeper in 2005 (ECF No. 40, Ex. D at 176).  She testified that part of her duties was to process checks and pay bills (*id.*).  Ms. Shephard reviewed nearly one hundred checks that were made payable to Petitioner and identified his signature on the back of each check (*id.* at 177).

Tom Bishop, an investigator with the Florida Department of Business and Professional Regulation, testified that he became involved in this case when Ms. Griffin and her attorney filed a complaint against Petitioner with the Department (ECF No. 40, Ex. D at 219).   He testified that he found no evidence that Petitioner was licensed to engage in contracting as a state registered or state certified contractor in

the State of Florida (*id.* at 220–21).  He also testified that there was no evidence that Petitioner, doing business as Global Development and Construction, was licensed to engage in contracting as a state registered or state certified contractor in the State of Florida (*id.*).  Mr. Bishop testified that "contracting" is the "attempted sale" or "the negotiations for a bid for a contract" (*id.* at 222).  He testified that any proposal that is presented by an individual constitutes contracting, and that even the offering of construction services constitutes contracting (*id.*).  Mr. Bishop testified that the evidence that Petitioner was "contracting" in this case was the contract that Petitioner created with Ms. Griffin (*id.*).  He noted that it was a "cost plus contract," meaning that there was no set price or contract amount (*id.*).  Mr. Bishop testified that signing that contract constituted contracting in the State of Florida  (*id.*).  He testified that receiving money for construction projects and actually building a house also fall under the definition of contracting (*id.* at 222–23).  Mr. Bishop testified that the receipt of money for construction projects "really seals the deal" in the Department's eyes, in terms of determining whether one has engaged in contracting without a license (*id.* at 223).

Mr. Bishop testified that he contacted Mike Gordon, the building official for Bay County, about this case (ECF No. 40, Ex. D at 226–27).  He testified that he contacted Mr. Gordon because Ms. Griffin's contract was with an unlicensed

contractor, but a building permit had been issued on the project (*id.* at 227).  Bishop

testified that there are situations where an unlicenced contractor may legally work

with a general contractor as long as that individual is working under the direct

supervision of that licensed contractor (*id.* at 228).  He testified that the unlicensed

contractor must be an employee of the general contractor, and the general contractor

must withhold taxes, carry workers' compensation, and pay FICA on the individual

(*id.*).  Mr. Bishop testified that he did not find any evidence in this case that Petitioner

was working as an employee of a licensed contractor (*id.*).

On cross-examination, Mr. Bishop testified that building permits for the project

were obtained by an individual named Al Hancock (ECF No. 40, Ex. D at 228–30).

He testified that Al Hancock is a Florida licensed general contractor (*id.* at 230).  Mr.

Bishop repeated that, for an unlicenced contractor to work under a licensed contractor,

the licensed contractor must pay the unlicenced contractor and withhold employment

taxes (*id.* at 232).  He testified that he investigated Mr. Hancock's involvement in Ms.

Griffin's project (*id.* at 233).  Mr. Bishop testified that Mr. Hancock violated Florida's

contracting laws by "aiding and abetting" Petitioner's contracting without a license

(*id.* at 234).  He testified that Hancock was charged with violating Florida Statutes §

489.129 (1) and (D) for performing any act which assists a person or entity in

engaging in the prohibited unregistered and uncertified practice of contracting, and Hancock was fined for the violation (*id.*).

Lou Wenick, a professional engineer and construction industry consultant, testified that he visited the construction site for Ms. Griffin's project, and estimated that the value of the structures that Petitioner constructed, including labor and materials, was approximately $356,000.00 (ECF No. 40, Ex. D at 193–202).

Brian Davidenko, a builder in Bay County, testified that he visited the construction site for Ms. Griffin's project, and estimated that the value of the structures that Petitioner constructed, including labor, materials, and a 10% markup for the contractor, was approximately $302,000.00 (ECF No. 40, Ex. E at 242–47).

At the conclusion of Petitioner's trial, the jury was instructed as follows:

> Now, to prove Count II, the crime of contracting without being certified or registered during a state of emergency, the State must prove the following two elements beyond a reasonable doubt:  Number one, Stephen Garrett [sic] Palmer did engage in the business or acted in the capacity of a contractor or advertising [sic] as available to engage in the business or act in the capacity of a contractor.  And, two, Stephen Jarrett Palmer did so without being duly registered, certified, or having a certificate of authority.  If you determine the Defendant guilty of engaging in contracting without a license, you must determine by your verdict whether the conduct occurred during a state of emergency declared by executive order of the Governor of the State of Florida.
>
> Contracting means engaging in business as a contractor and includes undertaking to, submitting a bid to, or by himself, or by others constructing, repairing, altering, remodeling, adding to, demolishing,

subtracting from, or improving any building or structure, including related improvements to real estate for others or for resale to others.

The attempted sale of contracting services and the negotiation or bid for contract on these services also constitutes contracting.

Contractor means the person who for compensation undertakes to, submits a bid to, or does himself or by others, construct, repair, alter, remodel, add to, demolish, subtract from, or improve any building or structure, including belated improvements to real estate for others or for resale to others.

Registered means registration with the Department of Business and Professional Regulation pursuant to fulfilling the competency requirements in the jurisdiction for which the registration is issued.

Certified means holding a certificate of competency issued by the Department of Business and Professional Regulation.

State of emergency means an executive proclamation issued by the governor about, upon his finding that an emergency has occurred, or that the occurrence or the threat thereof is imminent.

Emergency means any occurrence or threat thereof, whether natural, technological, or man-made in war or at peace which results or may result in substantial injury or harm to the population or substantial damages to the loss of property.

(ECF No. 40, Ex. E at 331–33).

Considering all the evidence, old and "new," the undersigned concludes that even if the jury had been aware that the construction contract identified Global Development as the contractor and expressly stated that Global was not a licensed contractor in Florida but would use a licensed contractor (Al Hancock) to perform the

work, Petitioner has not shown that no juror, acting reasonably, would have voted to find him guilty, *see* <u>McQuiggin</u>, 133 S. Ct. at 1928, 1931, 1933.  The testimonial and documentary evidence showed that Petitioner undertook to construct Ms. Griffin's home and three additional structures, and negotiated a contract with her for the construction project.  Petitioner discussed the details of the construction project with Ms. Griffin, estimated the cost as 1.2 million dollars, negotiated the terms of the contract, signed the contract, and accepted hundreds of thousands of dollars directly from Ms. Griffin and ERC as payment for the construction project.

Furthermore, although the "Complete Contract" would have impeached Ms. Griffin's testimony that she believed that Petitioner was a Florida licensed contractor, and that she had never heard of Al Hancock, any value to the defense would have been diminished by the fact that the Complete Contract promised Ms. Griffin that Petitioner would use a Florida licensed contractor to perform or administer the contract, which did not occur according to the testimony of Mr. Bishop.  As Mr. Bishop testified, Mr. Hancock's only involvement in the project was obtaining building permits, but Hancock did so illegally, because he never directly supervised Petitioner or paid Petitioner as his employee.

This is not one of the "extremely rare" cases in which Petitioner has made a colorable showing that he is actually innocent, *see* <u>Schlup</u>, 513 U.S. at 327.

Therefore, he failed to demonstrate he is entitled to review of his § 2254 petition through the "actual innocence" gateway.

Furthermore, Petitioner has failed to demonstrate that staying this federal habeas case until the state court rules on his freestanding "newly discovered evidence" claim is warranted.  His § 2254 petition is not a "mixed" petition; therefore, the "stay and abeyance" procedure approved in <u>Rhines</u>, 544 U.S. 269, is not warranted. Further, the state court's disposition of his "newly discovered evidence" claim would not affect this court's conclusion that Petitioner's federal habeas petition is untimely. Therefore, Petitioner's "Request for an Enlargement of Time of Ninety (90) Days to Allow Retained Counsel to Pursue Petitioner's Amended Postconviction Motion in the State Court" (ECF No. 37) should be denied.

## III.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(a), Rules Governing Section 2254 Cases.  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.  Rule 11(a) additionally provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Rule 11(a), Rules Governing Section 2254 Cases.  If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That Petitioner's "Request for an Enlargement of Time of Ninety (90) Days to Allow Retained Counsel to Pursue Petitioner's Amended Postconviction Motion in the State Court" (ECF No. 37) be **DENIED**.

2.     That Respondent's motion to dismiss (ECF No. 25) be **GRANTED**.

3.     That the amended habeas petition (ECF No. 12) be **DISMISSED** with prejudice as untimely.

4.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 9<u>th</u> day of December 2015.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.